**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Charles P. STREICH,
Defendant-Appellant.**

**No. 84–1228.**

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 5, 1984.

Decided March 19, 1985.
Rehearing Denied May 8, 1985.

Ted S. Helwig, Asst. U.S. Atty., Dan K. Webb, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Andrew B. Spiegel, Chicago, Ill., for defendant-appellant.

Before CUMMINGS, Chief Judge, and WOOD and ESCHBACH, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

Charles P. Streich appeals his convictions for assaulting two IRS revenue officers and three IRS special agents with a dangerous weapon in violation of 18 U.S.C. § 111 and for possessing an unregistered firearm in violation of 26 U.S.C. § 5861(d).

## I.

In January, 1983 IRS Revenue Officer Mary Janic received the assignment of collecting a $500 penalty assessed against Charles P. Streich for filing an allegedly false W–4 Form. On January 28, 1983, she went to Streich's residence in Elwood, Illinois and spoke with him about the money owed. Streich said he did not owe any money and refused to pay.

Janic proceeded to investigate Streich's assets and to file a federal tax lien on one of his two motor vehicles, a Ford Cherokee jeep. On May 9, 1983, Janic mailed Streich a "10-day-letter" informing him that if he did not pay the $500 penalty within ten days Janic would enforce the tax lien. Streich received the letter on May 11 and responded on May 21 or 22 with a letter to Janic from one Paul Bell, leader of the Belanco Religious Order, a tax protesting group of which Streich was a member. The letter stated that Streich did not have enough income to be required to file a tax return and that further action by Janic to recover the $500 could be considered a violation of Illinois state extortion and grand theft laws as well as federal law prohibiting a federal officer from using his office to extort from or willfully oppress another under color of law, knowingly demanding other or greater sums than authorized by law, or making fraudulent statements, 26 U.S.C. § 7214(a)(1), (2), (7) (1982). The letter also requested a letter of apology from Janic and urged her to repent of her sinful ways by turning to Christ and giving up her job as Matthew did, and by restoring fourfold any monies she had taken under false pretenses as Zacchaeus is reported to have done in Luke 19:8. Enclosed with the letter were several printed Belanco articles written by Paul Bell espousing a belief in the unconstitutionality of federal and state income tax laws.

On the 11th day following the date of the "10-day-letter," Janic, accompanied by several other IRS agents, went to Streich's home to ask him to consent to their taking the Cherokee jeep to satisfy the penalty. No one answered the door and the agents left. Janic then obtained an order, dated June 10, 1983, to enter the premises for the purpose of seizing the levied jeep.

On June 14, 1983, around 1:45 P.M., Janic, her manager, three IRS special agents, and a private towing truck operator went to Streich's home to seize the jeep. There were two vehicles in Streich's driveway and the agents parked behind the 1979 Cherokee jeep which was to be seized.

As they arrived, Mrs. Streich was loading puppies into the jeep. Janic identified herself and showed Mrs. Streich her credentials. Mrs. Streich began removing the puppies from the jeep and one of the Streich children went inside the house to get Mr. Streich.

Mr. Streich came out of the house. He asked Janic if she had received his letter.

Janic identified herself, showed Streich her credentials, and told him that if he did not pay the $500 his Cherokee would be seized. Janic then attempted to hand Streich copies of the papers showing her authority to seize the jeep. After initially refusing, Streich took the papers and went inside. Streich returned from the house with a camera and took fifteen or twenty pictures. Janic put a seizure sticker on the back window of the jeep. Streich told his wife that he had called the Posse Commitatus and that "Sam," apparently a reference to Santos Flores, was on his way.

Streich retreated into his home once again and came back out to tear the seizure sticker off the Cherokee and to tell the agents that they were not going to take his property. Streich went back inside the house and the tow truck began hooking up to the Cherokee. Streich emerged from the house again, this time brandishing a gun. There is conflicting testimony as to whether Streich pointed the gun directly at the IRS officers. In any event, Streich "swept the field" with his gun, as he explained, pointed toward the ground as he had been trained to do in the Navy to control riots. Streich told the agents to back off and that they were not going to take his jeep. The agents then waved the tow truck away and returned to their car. Streich followed them to the street with his gun about eight feet away from them. The agents left the premises without the Cherokee.

At some point after the agents arrived and before they left, Streich's four-year-old son, John, developed a bloody nose. John had a history of bloody noses and neither Mr. nor Mrs. Streich knew exactly when or how he got this one.

That same day, after the IRS agents left, four Will County deputy sheriffs came to Streich's house in response to calls by some of Streich's neighbors who noticed the incident in front of Streich's home. Streich first told the deputy sheriffs that there had been no disturbance; then he told the deputies that some repossessors from a Ford dealership had tried to repossess his car and that he had run them off with a gun.

The deputies asked to see the gun Streich had used and a firearms owner's identification card. Streich refused to bring the gun outside but did show the gun to the deputies through the front-door window. One of the deputies copied down the serial number of the gun, but Streich never allowed any of the deputies to touch the gun. Streich had a firearms owner's identification card and the deputies determined that the gun was not stolen, so they let Streich keep the gun.

The next day, June 15, 1983, two federal warrants issued concerning Streich: one for his arrest and the other to search his home for the gun he had used the day before. Streich was arrested on June 16 outside his home without incident. The search warrant was never executed because one of Streich's friends, a Mrs. Flores, returned the gun to Streich's house and gave it to an IRS investigator. Streich had given the gun to Mrs. Flores's husband, Sam, on June 14, 1983, the day of his altercation with the IRS agents.

The gun Flores turned over is an AR–15 rifle, a civilian model of a military M–16 rifle. An AR–15 can fire in a semi-automatic mode. An M–16 can fire in a fully automatic mode, meaning that with one pull of the trigger multiple shots are fired until the trigger is released. There are numerous ways of converting an AR–15 to an M–16 and the parts for doing so are readily available to the public. At trial Streich testified that he was a member of a gun club, had seen manuals on how to convert an AR–15 to an M–16, and knew where to get the parts to complete a conversion.

On June 21, IRS Investigator Niezgoda took the gun to the local Bureau of Alcohol Tobacco and Firearms ("BATF") office for testing. BATF Special Agent Douglas Moore was the first person to examine the weapon. Niezgoda dictated a memo on June 21, 1983 which states that Moore's examination of the gun indicated that the gun needed two additional parts, an M–16

bolt and either an M–16 sear or a drop-in auto sear to be capable of fully automatic fire. It is unclear from the record what kind of test or examination Agent Moore performed.[1]

On the same day a second local BATF official, Michael VanAmburgh, a BATF criminal investigator, examined the gun after Moore. VanAmburgh did a "standard undercover field test" to determine if the gun could function in a fully automatic mode. VanAmburgh uses the "standard undercover field test" when he works undercover and is attempting to determine if someone is trying to sell him an automatic weapon. From that test he determined that the "weapon very possibly would operate in a fully automatic mode."

The next day, June 22, Niezgoda and VanAmburgh went to the Bolingbrook, Illinois Police Department where VanAmburgh test-fired the gun on the police range. The gun fired more than one round with a single pull of the trigger. After this test-firing, VanAmburgh told Niezgoda that he thought the gun was firing in a fully automatic mode.

VanAmburgh then telephoned James Cain, a gun expert at the National Laboratories of the United States Treasury BATF in Washington to discuss the gun and the testing. In accordance with Cain's suggestion, VanAmburgh performed another test on the gun on June 23. This test-firing was videotaped and shown to the jury at trial. In this test the gun fired several rounds with one pull of the trigger on several occasions. Following this test by VanAmburgh, Niezgoda sent the gun to James Cain for further testing. Agent Cain tested the gun and filed a report stating that it was capable of firing in an automatic mode.

On this appeal, Streich raises several challenges to his convictions for assault on a federal officer with a dangerous weapon

and possession of an unregistered fully automatic weapon. He challenges his assault conviction on grounds that the IRS officers and special agents were not engaged in the performance of their official duty when they attempted to seize his jeep; that the trial judge committed reversible error in refusing to allow Mrs. Streich to answer two questions about incidents in the neighborhood prior to the alleged assault; and that the judge committed reversible error in refusing to define willful in his jury instruction. Streich challenges his conviction for possession of an unregistered firearm on grounds that the trial court committed reversible error in refusing to suppress the gun and by refusing to allow Streich to examine and test the gun. Streich also challenges both convictions as unsupported by the evidence.

We consider these challenges in turn.

## II.

■ Streich argues that his conviction under 18 U.S.C. § 111 for assault on a federal officer with a dangerous weapon should be reversed since the IRS officers and agents he allegedly assaulted were not "engaged in the performance of official duties" when they came to his home to enforce the tax lien. Streich makes three arguments as to why the officers were not engaged in the performance of their official duties: first, because the statute under which the $500 penalty was assessed, 26 U.S.C. § 6682, is unconstitutional as a violation of the separation of powers principle; second, because Streich filed his allegedly false W–4 Form before December 31, 1981, the date the 18 U.S.C. § 111 took effect and 18 U.S.C. § 111 is therefore not applicable to Streich; and third, because the officers and agents denied Streich his procedural due process rights in using the civil suppressed docket to obtain the court levy order. We need not rule on the constitutionality or applicability of the statute or

---

**1.** Streich's attorney attempted to introduce this memorandum into evidence during his direct examination of Joseph Kezerle, a self-taught gunsmith. The trial judge excluded it. Agent Moore was made available to Streich as a wit-

ness but Streich chose not to call him. The government never attempted to introduce the memorandum or call Agent Moore because it did not consider him a qualified expert and because it thought his assessment erroneous.

the legality of the levy order since we hold that, even if the statute is unconstitutional and inapplicable and the levy order was improperly obtained, the officers and agents who went to Streich's home on June 14 were engaged in the performance of their official duties and therefore protected under section 111.

■ Whether a federal officer is "engaged in ... the performance of his official duties" under section 111 does not turn on whether the law being enforced is constitutional or applicable to the defendant, or whether the levy order being enforced was validly obtained; rather it turns on whether the federal officer is "acting within the scope of what [he] is employed to do ... or is engaging in a personal frolic of his own." *United States v. Heliczer*, 373 F.2d 241 (2d Cir.), *cert. denied*, 388 U.S. 917, 87 S.Ct. 2133, 18 L.Ed.2d 1359 (1967); *see also United States v. Simon*, 409 F.2d 474 (7th Cir.) (adopting the *Heliczer* test in dictum), *cert. denied*, 396 U.S. 829, 90 S.Ct. 79, 24 L.Ed.2d 79 (1969). There is no intimation in Streich's brief or in the record that these officers and agents were engaged in a "personal frolic." Clearly they were performing an official duty when they went to Streich's house to seize the jeep to enforce a tax penalty and were thus due the protections of section 111. We therefore reject Streich's claim that the officers were not engaged in the performance of their official duties.

### III.

■ Streich's second challenge to his assault conviction is that the trial court committed reversible error when it sustained objections to two questions asked of Mrs. Streich on redirect examination concerning incidents in the area of her home. Streich argues that exclusion of this testimony prevented him from relying on a reasonable use of force defense.

The specific questions to which objections were sustained were as follows:

Q. Were there certain incidents that had happened in your neighborhood that led you to have this fear [of the officers and agents on June 14, 1983]?

Q. Is it true that you were afraid that your children were going to be hurt by these people?

Although Mrs. Streich's answers to these questions regarding the incidents in the neighborhood could have been relevant to Mr. Streich's defense, since they would speak to the reasonableness of Mr. Streich's belief that use of force was necessary to protect himself or his family, such testimony would also have been cumulative. Prior to the asking of the above-quoted questions Mrs. Streich had already testified on recross-examination that she thought the agents

were people that had come to do something because in our area we have got a lot of things going on when people have pretended they are hitchhikers and they come out and they are really not, and they shoot people, and after so many incidences in Will County, and it was even on the news what was happening in Joliet and everything, so when these people came and you're in a desert—like an area that is away from police protection and that, you get scared and you worry what are they going to do to you.

Mrs. Streich had also testified that she thought the agents were strange people who were going to kill or rob because of "things happening in our community."

Rule 403 of the Federal Rules of Evidence permits a judge to exclude testimony which is cumulative even if relevant. In view of this prior testimony, answers to the above-quoted questions would have been cumulative and thus the district judge did not abuse his discretion in sustaining objections.

### IV.

■ Streich complains that the trial judge committed reversible error in refusing to instruct the jury on the definition of willful even though he gave willfulness as one of the elements of the assault count. This refusal was not error.

The Committee on Federal Criminal Jury Instructions of the Seventh Circuit has recommended "that an instruction defining the word 'willfully' not be given unless the word is in the statute defining the offense being tried." *See* Pattern Jury Instruction 6.03 (7th Cir.1980). Willfulness is not an element of assault of a federal officer with a dangerous weapon under 18 U.S.C. § 111 nor was willfulness used in the indictment charging Streich. The trial judge committed no error in following this circuit's recommendation and refusing to instruct on the definition of willful, a word commonly understood and not contained in section 111.

V.

Streich appeals his conviction for possession of an unregistered fully automatic weapon on grounds that the trial court committed reversible error in denying his motion to suppress the rifle seized by the IRS agents on June 16, 1983. Streich contends that the seizure was unlawful because of the allegedly threatening conditions under which the agents seized the gun and because of the invalidity of the search warrant. We reject both arguments.

■ Streich's argument that the rifle was unlawfully seized because obtained by threats and coercion flies in the face of the trial court's explicit finding at the suppression hearing that "no coercion or duress was used in connection with the effort to obtain the weapon...." We must affirm a trial court's findings of fact at a suppression hearing unless clearly erroneous. *See United States v. Williams*, 737 F.2d 594, 602 (7th Cir.1984), and cases cited therein.

The record shows that after arresting Streich the agents told him they would search his house for the gun if he did not produce it for them. Streich told the agents that the rifle was not in the house, because he had given it to a friend, Sam Flores. Streich then told his wife to call Mr. Flores and tell him to bring the rifle over. Mrs. Streich had in fact already called Mr. Flores and he arrived, albeit without the gun, about fifteen minutes later. Mr. Flores said that he had the rifle at his home and that he would call his wife and tell her to bring the gun over. Mrs. Flores arrived with the gun shortly thereafter and gave it to the agents.

■ The gist of Streich's argument is that in threatening to execute the search warrant the authorities used coercion and duress to seize the gun. We disagree. The agents possessed a search warrant which gave them the authority to search Streich's entire home for the gun. Before conducting such an extensive, albeit lawful, search the agents first gave Streich an opportunity to prevent the search by voluntarily producing the gun. Giving Streich a choice between producing the gun and having his home searched is hardly coercive; indeed it represents commendable restraint by the agents.

Streich's second attack on the seizure is that the search warrant was defective in two respects: first, because it was based on the false statement by Agent Holley that the gun was concealed in Streich's home when in fact it was in Flores's home; and second, because the magistrate issuing the warrant did not know, when he issued the warrant, that the Will County Sheriff's office had filed a report stating that the gun was a non-automatic AR–15 after having interviewed Streich on June 14, 1983, regarding his altercation with the IRS agents. Both arguments are groundless.

■ Initially we note that the search warrant was never executed. Mrs. Flores brought the gun from her home and gave it to the agents pursuant to Streich's request. Thus the validity of the search warrant is actually irrelevant.

■ Nevertheless, the search warrant was valid. The warrant was based on the affidavit of Agent Holley which stated that while Holley was present at the attempted seizure of Streich's jeep on June 14, 1983, he observed Streich "exit[ ] his residence brandishing a weapon which appeared to be either an M–16 fully automatic or an AR–15 semi-automatic rifle." Agent Holley did

not state in his affidavit, as defendant claims, that he knew the gun was in Streich's home. Rather he stated facts that gave him *reason to believe* that the rifle was in Streich's home. That was a truthful statement of his belief. That the gun was in fact not in the home does not make the statement of belief itself false or invalidate the warrant.

Streich's second attack on the search warrant is that the magistrate issuing the warrant did not know that the Will County Sheriff's office had already been to the scene of the incident and made no arrest after looking at the gun through Streich's front-door window. This lack of knowledge does not invalidate the warrant. *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) does not, as the defendant suggests, require that the magistrate be informed of all circumstances before issuing a warrant. Rather *Gates* relaxed the rigid "two-prong test" of *Aguilar* and *Spinelli* for determining whether an informant's tip establishes probable cause and replaced it with the "totality of the circumstances" approach. Under this test the task of the magistrate is to make a practical, common-sense decision on probable cause based on *"all the circumstances set forth in the affidavit before him." Id.* 103 S.Ct. at 2332 (emphasis added).

## VI.

Streich claims that the district court violated his fifth amendment right to due process and sixth amendment right to effective assistance of counsel and to confront witnesses against him and committed reversible error when it allegedly refused to allow him to examine and test the rifle. Streich claims that he requested and was denied the opportunity to examine and test the gun three times: before, during, and after trial.

Streich claims that he first requested production of the gun in his pretrial motion for discovery wherein he requested discovery of "tangible objects ... which the government intends to introduce at trial to prove its case-in-chief, or which were obtained from or belonged to the Defendant." Although this general request technically includes the gun, we hold that under the circumstances of this case this request was not specific enough.

Streich knew that the government had the gun and intended to introduce the gun at trial; furthermore, he had access to the government's file which contained the name of the BATF gun expert, James Cain, who had examined the gun and his examination report. Under these circumstances, if Streich wanted to have the gun examined by his own expert before trial he should have specifically requested discovery of the gun. He could have made this specific request either in his original Motion for Discovery or, failing this, in an Amended Motion for Discovery after the government failed to produce the gun pursuant to his general request for "tangible objects." *Cf. United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) (holding that the more general the defendant's request for exculpatory material the higher the materiality standard for setting aside a conviction).

Streich also claims that he requested and was denied the right to examine and test the gun during trial. He cites to page 284 of the trial transcript. That page of the transcript records a side-bar discussion concerning the issue of whether the government should be permitted to play for the jury a videotape of BATF Agent VanAmburgh's test-firing the gun. The trial judge stated that he was inclined to permit the videotape to be played because the defendant was raising the issue of whether the rifle was actually capable of firing in a fully automatic mode. At that point, defense counsel stated, "Well, if your Honor is suggesting that the tape be shown, then the defendant moves that we have a test-firing in the presence of the jury with blanks." This did not constitute a request for an independent examination and testing of the gun. Defense counsel apparently requested the live test-firing with blanks as an alternative to showing the videotape

test-firing because he was concerned that the jury would be prejudiced when they saw projectiles in the test-firing. The judge rejected this request because he thought that a live test-firing was potentially even more prejudicial than the videotape test-firing and because the videotape did not show the projectiles hitting a target or destroying anything. The trial court's rejection of this mid-trial request for a live test-firing with blanks was eminently reasonable and did not infringe any of defendant's rights.

▆▆▆ Not until after trial, in his motion for a new trial, did Streich specifically and unequivocally request that he be given the gun for independent examination and testing. The court denied his motion for a new trial. Streich appeals because he believes that there is substantial basis to believe that independent testing would reveal that the gun is not capable of automatic fire. We consider Streich's claim as one for a new trial based on discovery of new evidence, or perhaps more accurately, based on his assertion of the possible discovery of new evidence. To prevail on such a motion a defendant must show that the evidence (1) came to his knowledge only after trial, (2) could not have been discovered sooner had defendant exercised due diligence, (3) is material, and not merely impeaching, or cumulative, and (4) would probably lead to an acquittal in the event of a retrial. *United States v. Hedman,* 655 F.2d 813, 814 (7th Cir.1981). "[T]hese standards reflect the fact that such motions 'are not favored by the courts and are viewed with great caution.'" *United States v. Oliver,* 683 F.2d 224, 228 (7th Cir.1982) (quoting *United States v. Curran,* 465 F.2d 260, 262 (7th Cir.1972)). Our review is limited to whether the district court abused its discretion, *id.,* and we find no abuse in this case.

▆▆ Streich knew that the government had tested the gun and would introduce the test results at trial. He could have tested it before trial, or perhaps even during trial, had he exercised due diligence and asked for it specifically. He thus fails to satisfy

the due diligence requirement. Nor does Streich satisfy the fourth requirement of showing a probability of acquittal if a new trial were granted. Streich does not actually have new exculpatory evidence, rather he asserts that testing might produce the evidence. He supports this assertion by pointing to the Niezgoda memorandum of June 21 which reports that local BATF Agent Moore's examination of the same day indicated that the gun lacked two parts necessary for operation in a fully automatic mode. At trial Streich attempted to introduce this memorandum during cross-examination of Agent Niezgoda. The trial judge properly excluded the memorandum. The best evidence concerning Agent Moore's examination and his conclusion regarding the gun was Agent Moore himself. And, although the government made Agent Moore available to defendant as a witness, counsel for the defendant chose not to call him. The government never attempted to introduce the memorandum or call Agent Moore because it did not consider him an expert and because it thought his assessment erroneous. In view of these apparently conscious decisions by the defendant and the government not to call Agent Moore, we do not consider the memorandum reporting on his examination of the gun in deciding this motion for a new trial. Absent any reliable corroborating evidence, Streich's assertion that an independent examination would disclose new evidence does not satisfy the fourth requirement of showing a probability of acquittal if a new trial were granted.

Defendant's assertion, based solely on properly excluded evidence, that an independent examination and testing of the gun might disclose new evidence that the government tampered with the gun is not a sufficient basis for granting a new trial, especially where before trial the defendant knew that the government would introduce expert testimony that the gun is capable of firing in a fully automatic mode and failed to request an independent examination and testing with any degree of specificity.

## VII.

Streich's final argument is that the evidence is insufficient to support his conviction on either count.

 It is well established that when an appellate challenge is made to the sufficiency of the evidence, the evidence and all reasonable inferences which can be drawn from the evidence must be viewed in the light most favorable to the government. *See United States v. Redwine*, 715 F.2d 315, 319 (7th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 2661, 81 L.Ed.2d 367 (1984). Our review of the record convinces us that there was sufficient evidence to convict on both charges.

As to count I, assault on a federal officer, Streich argues that the evidence was insufficient to establish that he used unreasonable force to protect himself, his family, or his property. We disagree. Evidence was presented from which a reasonable juror could conclude that Streich acted unreasonably in running the officers and agents off his property with a rifle. The jury heard testimony that Streich knew the people on his property were IRS officers and agents seeking to enforce a levy order on his jeep, that the officers and agents never drew or otherwise threatened to use their concealed weapons, that the officers and agents indeed never threatened harm to anyone, that Streich never called the sheriff or other law enforcement authorities to seek their assistance, and that Streich's son had a history of getting nosebleeds. Furthermore, the jury heard testimony that Streich did not believe in the legitimacy of the current tax system, that he could not discuss the IRS or taxes with his wife without becoming upset, and that he called the "Posse Commitatus" when the IRS agents arrived to take his jeep. The jury also saw the BELANCO material Streich sent to Janic in response to the "10-day-letter." This material espoused the view that the tax system is unconstitutional and that Janic was engaged in a sinful enterprise in seeking to enforce the tax laws. All this evidence is more than sufficient to support the conclusion that Streich did not act out of a belief that the officers and agents threatened harm to himself, his family, or his property, but rather out of a fervent, almost religious, belief in the illegitimacy of the tax laws and in his right to use force or threats of force to fend off those seeking to enforce the laws.

As to count II, possession of an unregistered firearm, Streich contends that the evidence is not sufficient to establish that he possessed an automatic weapon on June 14, 1983, or that he knew that his gun was in fact automatic.

The evidence showed that the rifle obtained by the agents on June 15, 1983, was the same one used by Streich on June 14, 1983, because the serial number on the rifle matched the serial number on the gun Streich showed the Will County deputy sheriffs on June 14. Streich claims, however, that the evidence did not establish that the gun had the same parts in it on June 14 as it did when the government examined and tested it on June 21, 22, and 23. Government witnesses testified concerning both the chain of custody and the testing of the gun and the defendant cross-examined them. This testimony provides a basis for finding that the gun's parts were not changed while the gun was in the government's custody.[2] The evidence was thus sufficient to establish that Streich possessed an automatic weapon on June 14, 1983.

Streich's knowledge that the gun was automatic is supported by Streich's own testimony that he was a member of a gun club, had seen manuals on how to convert an AR–15 to an M–16, and knew where to get the M–16 parts to complete a conversion.

---

2. Streich points to the Niezgoda memorandum stating that Agent Moore's examination of the gun on June 21 indicated that the gun lacked all necessary parts for firing fully automatically as support for his lack of sufficiency claim. We do not consider this memorandum in ruling on this claim, however, because the memorandum was properly excluded, and, although Agent Moore was made available to Streich as a witness, Streich chose not to call him.

For the foregoing reasons we AFFIRM the conviction on both counts.