UNITED STATES of America,
Plaintiff-Appellee,

v.

Orley E. PERLAZA and Alvaro Llanos,
Defendants-Appellants.

Nos. 86–1310, 86–1325.

United States Court of Appeals,
Seventh Circuit.

May 13, 1987.

James R. Holloway, Jerry B. Kurz, Federal Defender Program, Chicago, Ill., for defendants-appellants.

Patrick J. Foley, Asst. U.S. Atty. (Anton R. Valukas, U.S. Atty.), U.S. Attorney's Office, Chicago, Ill., for plaintiff-appellee.

Before WOOD, and RIPPLE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

HARLINGTON WOOD, JR., Circuit Judge.

The United States charged defendants Orley Perlaza and Alvaro Llanos with conspiracy to distribute cocaine and to possess cocaine with an intent to distribute it in violation of 21 U.S.C. § 846 (1982). In addition, the United States charged defendant Perlaza with possessing cocaine with an intent to distribute it and charged defendant Llanos with aiding and abetting Perlaza's possession of the same, all in violation of 21 U.S.C. § 841(a)(1) (1982). A jury found both defendants guilty of all counts as charged. The district judge subsequently sentenced Perlaza and Llanos on their convictions. Perlaza and Llanos appeal their convictions on the bases of insufficiency of the evidence and an improper jury instruction. We affirm.

## I. FACTUAL BACKGROUND

Early in the morning of June 20, 1985, a Chicago police lieutenant assigned to the Chicago Police Department's Drug Enforcement Administration Task Force learned from another officer that ten kilograms of cocaine were being brought into Chicago by a Freddie Correra. Knowing that Correra had been previously observed at the residence of defendant Alvaro Llanos, at 5042 North Lawndale in Chicago, the lieutenant made arrangements to set up a surveillance operation in that area.

About 8:45 a.m. that same morning in a different part of the city, and unbeknownst to the police lieutenant and his emerging surveillance team, another part of this scenario began to unfold. Defendant Orley Perlaza and a second man registered for a room for two at the Caravelle Motor Inn located near Chicago's O'Hare Airport in Rosemont, Illinois. Both men were middle-aged Hispanics. Perlaza was assisted in registering for the room by the second man—Perlaza apparently spoke only broken English. Perlaza first signed the registration folio. Perlaza then produced his driver's license and passed it to the second man along with the registration folio. The second man wrote the license number from Perlaza's driver's license onto the folio. He also wrote the address "4936 N. Lawndale" on the folio,[1] although Perlaza's license had an address listed as "3105 W. George Street." Perlaza then took the folio back and rewrote, on the bottom portion of the folio, the address that the second man had written on the top portion; he omitted one number, however, by writing the address number as "493" instead of "4936."

Having finished writing in the folio, the second man completed the registration process by paying for the room in cash from a large amount of cash in his pocket. The registration clerk then assigned Perlaza and the second man to room 116. Neither man had any luggage. A maid testified

---

1. The address written down by the second man, 4936 North Lawndale, was in close proximity to the address of Llanos's residence, 5042 North Lawndale, at which the police team was conducting its surveillance operation.

she saw Perlaza enter room 116 later that morning.

Back to the police operation, by 10:30 a.m. the Chicago police lieutenant had a surveillance team in place near Llanos's residence. The team consisted of himself and five or six other police officers, each equipped with a separate automobile, binoculars, and a radio transmitter.

Freddie Correra never appeared at Llanos's residence. But at 1:30 p.m., Llanos and an unidentified male, female, and child left Llanos's residence and got into a black Subaru automobile. For the next thirty or forty minutes, Llanos drove the Subaru around his general neighborhood in an unusual fashion, circling blocks and driving very slowly, sometimes stopping completely at a curb and then driving off again. Llanos eventually arrived at a laundromat at Montrose and Francisco Streets. Although this trip took thirty or forty minutes, a normal driving trip from Llanos's residence to the laundromat would take only five or ten minutes to complete.

Llanos and the male, female, and child got out of the Subaru and went into the laundromat. Over the next forty-five minutes Llanos placed and received at least twelve telephone calls at a pay telephone located in the laundromat. At the conclusion of this series of telephone calls, a Lincoln Versailles automobile pulled into the parking lot of the laundromat. The Lincoln had no license plates. Llanos walked out of the laundromat and approached the Lincoln. He shook hands and had a brief conversation with the driver of the Lincoln, William Marulanda.[2] Following this brief conversation with Marulanda, Llanos got into the Lincoln. Marulanda and Llanos left the laundromat and drove west on Montrose Street. Shortly thereafter the male, female, and child who had accompanied Llanos to the laundromat got back into the Subaru and returned to Llanos's residence.

Marulanda and Llanos drove slowly on Montrose Street, stopping occasionally, and "backtracking" several times on other streets. They pulled into two gasoline stations, but sought no service, and then resumed driving on the streets in that neighborhood. They circled several blocks and then drove very slowly in the right-hand lane of Lawrence Avenue, a four-lane thoroughfare. From there, Marulanda and Llanos got onto the Kennedy Expressway, travelling in the far right-hand lane. They drove as slow as 35 m.p.h., which caused traffic to back up behind them on the expressway; the speed limit on the expressway was 55 m.p.h. Marulanda and Llanos then got off the Kennedy Expressway at Cumberland Avenue to go south. But instead of leaving the expressway on the southbound exit ramp, they left on the northbound exit ramp and then turned across the northbound traffic on Cumberland Avenue to travel south.

Marulanda and Llanos then pulled into the parking lot of the O'Hare Plaza Hotel located just south of the exit from the expressway onto Cumberland Avenue. They parked facing Cumberland Avenue and sat in the Lincoln for about five minutes. They then drove back onto Cumberland Avenue and reentered the Kennedy Expressway. Marulanda and Llanos drove to the next exit and got off the expressway at River Road. Circling and backtracking, they drove back to Cumberland Avenue. Once on Cumberland Avenue, they drove to the Caravelle Motor Inn, located at 5400 Cumberland Avenue—the same motel at which Perlaza and the second man had rented a room earlier that morning. All this driving from the laundromat, at Montrose and Francisco Streets, to the Caravelle Motor Inn, at 5400 Cumberland Avenue, took between forty-five minutes and one hour to complete. A normal trip from the laundromat to the motel would take from ten to thirty minutes to complete, depending on traffic conditions.

After parking the Lincoln in the parking lot of the Caravelle Motor Inn, Marulanda got out of the car and looked around. He went to the trunk, opened it, and put something inside a brown paper grocery bag

2. Marulanda was indicted along with Perlaza and Llanos, but he pleaded guilty before trial and did not testify at Perlaza's and Llanos's trial.

already in the trunk. Marulanda picked up the bag, which appeared to have clothing exposed at the top, and carried it into the motel. Once Marulanda was in the motel, Llanos got out of the Lincoln, looked around, walked toward a fenced-in swimming pool at the motel and then returned to the Lincoln.

After twenty minutes went by, Marulanda came back out of the motel and walked toward the Lincoln. He was carrying a brown paper bag, but it was smaller than the bag he had carried into the motel.

The Chicago police lieutenant and the other task force officers moved in and apprehended Marulanda and Llanos. The lieutenant examined the paper bag Marulanda was carrying and found within it a clear plastic bag containing a white, powdery substance. The white powder field-tested positive for cocaine. The officers orally advised Marulanda in English of his rights and provided him the same information in Spanish on a typewritten form. The officers also advised Llanos of his rights. Llanos said "he didn't understand what was going on … his car had broken down, that he never saw the driver of the Lincoln before, and that he just picked him up on the side of the road to assist him."

The lieutenant asked Marulanda from which room he had come and Marulanda led the lieutenant to room 116. No one was inside the room and Marulanda did not have a key to it.

Knowing that Marulanda had just come from room 116, the officers obtained the registration form from the desk clerk and ascertained that the room had been registered in Perlaza's name earlier that morning. The officers sought and obtained a search warrant for the room and began to search the room sometime after 9:00 p.m. Above the acoustic ceiling tiles in the bathroom of room 116, the officers discovered a blue gym bag. The gym bag had within it $34,230 in cash and numerous clear plastic bags containing 2541 grams of cocaine. The officers also discovered a triple-beam scale, a brown paper bag containing rags, a strainer, plastic bags, and two cans of acetone. (Acetone, when added to diluted co-caine, apparently makes the cocaine appear chunky and pure.)

Perhaps unaware of what had happened at the motel after he registered for room 116 on June 20, Perlaza returned to the motel by taxicab the next day. Perlaza apparently spoke better English than he had the day before because he asked in English to stay in room 116 for an additional two evenings. Perlaza filled out an additional registration form and asked for a key to room 116. He paid the room charge and a fee for an additional key and walked to room 116. As he did so, the desk clerk notified her supervisor that someone had inquired about room 116. The supervisor called the police.

A maid was there cleaning room 116 when Perlaza arrived. She asked Perlaza if he was checking out. He told her to leave the room. As she did so, she saw Perlaza enter the bathroom and heard him move the ceiling tiles.

A few minutes later Perlaza left room 116 and walked to the gift shop. The manager of the gift shop observed two "Colum-bian-looking males" in the gift shop approach Perlaza. She heard Perlaza tell them: "I asked her to leave the room."

Perlaza left the gift shop alone. He was immediately detained by police officers who had come to the motel after receiving the call from the desk clerk's supervisor. The other two men in the gift shop slipped away. A search of Perlaza incident to his arrest uncovered a key to room 116, receipts for room 116, and two driver's licenses, one in Perlaza's own name and one in the name of Freddie Correra. Perlaza told the police officers he had rented room 116 on both occasions because he had been instructed to do so by a "William," who had paid him twenty dollars to rent the room. One of the police officers retrieved a photograph of William Marulanda, who had been arrested along with Llanos at the motel the previous day, and three other photographs from a police album to conduct a photo spread identification. When handed the four photographs, Perlaza picked the one of William Marulanda as the "William" from whom he had taken his instructions.

## II. LEGAL STANDARDS

Perlaza and Llanos raise two issues on this appeal.

They first argue that the government's evidence was insufficient to support their convictions. When considering a challenge to the sufficiency of evidence, "[o]ur standard of review requires that the evidence be viewed in the light most favorable to the government in determining whether *'any rational trier-of-fact could have found the essential elements of the crime beyond a reasonable doubt.'"* *United States v. Draiman,* 784 F.2d 248, 251 (7th Cir.1986) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)) (emphasis in original); *United States v. Streich,* 759 F.2d 579, 588 (7th Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 172, 88 L.Ed.2d 142 (1985); *United States v. Roman,* 728 F.2d 846, 857 (7th Cir.), *cert. denied,* 466 U.S. 977, 104 S.Ct. 2360, 80 L.Ed.2d 832 (1984).

Perlaza also argues that the district judge improperly instructed the jury. "It is axiomatic that in determining the propriety of instructions they are to be viewed as a whole. As long as the instructions treat the issues fairly and adequately they will not be interfered with on appeal." *United States v. Patrick,* 542 F.2d 381, 389 (7th Cir.1976) (citations omitted), *cert. denied,* 430 U.S. 931, 97 S.Ct. 1551, 51 L.Ed.2d 775 (1977); *United States v. Thibodeaux,* 758 F.2d 199, 202 (7th Cir.1985).

## III. DISCUSSION

Perlaza and Llanos urge us to reverse their convictions because the government's evidence against them was insufficient and because the district judge improperly instructed the jury.

### A. *Sufficiency of the Evidence*

Perlaza and Llanos were charged with several crimes. They contend the government's evidence against them was insufficient on each crime charged.

### 1. *Conspiracy to Possess and Distribute Cocaine*

Perlaza and Llanos were charged with conspiring, along with William Marulanda, to distribute and to possess with an intent to distribute cocaine. They argue the government's evidence of their participation in a conspiracy was insufficient.

To prove Perlaza and Llanos participated in a conspiracy, the government must show initially that a conspiracy existed and secondly that defendants participated in the conspiracy.

#### a. Existence of a Conspiracy

"A conspiracy consists of a combination or confederation between two or more persons formed for the purpose of committing, by their joint efforts, a criminal act." *United States v. Hedman,* 630 F.2d 1184, 1192 (7th Cir.1980), *cert. denied,* 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981). The key element in this combination of two or more persons is an agreement. The agreement need not be marked by technical formalities. Indeed, such formalities are typically absent from a conspiratorial agreement because the "mark of a successful conspiracy is secrecy." *Id.; United States v. Varelli,* 407 F.2d 735, 741 (7th Cir.1969), *cert. denied,* 405 U.S. 1040, 92 S.Ct. 1311, 31 L.Ed.2d 581 (1972). The government may prove the existence of the conspiratorial agreement by circumstantial evidence. *United States v. Dalzotto,* 603 F.2d 642, 645 (7th Cir.), *cert. denied,* 444 U.S. 994, 100 S.Ct. 530, 62 L.Ed.2d 425 (1979); *United States v. Page,* 580 F.2d 916, 920 (7th Cir.1978) (pointing out that circumstantial evidence is permissible because "as a practical matter that evidence is often all that exists").

The evidence of a conspiracy against Perlaza and Llanos is largely circumstantial. We must look at all the evidence and inferences in the government's favor, not defendants', and decide whether any rational factfinder could conclude that a conspiracy existed.

■ Perlaza and a second Hispanic male registered for room 116 at the Caravelle Motor Inn. Perlaza entered room 116 on

the day he registered for it and also the following day when he renewed his registration and searched above the ceiling tiles in the bathroom. Perlaza claimed to be following the instructions of a "William," whom Perlaza later identified to be William Marulanda. Marulanda was the same person arrested at the motel after spending twenty minutes inside room 116. He had arrived at the motel with Llanos. Marulanda and Llanos were driving an automobile with no license plates. They had driven to the motel from the laundromat in an unusual manner that considerably lengthened their travel time. They met at the laundromat only after Llanos himself had driven from his residence to the laundromat in a similarly curious fashion. Llanos had placed and received at least twelve telephone calls from a pay telephone at the laundromat before Marulanda arrived to pick him up. Llanos lied to police officers at the time he and Marulanda were arrested.

This evidence, although circumstantial, points to the existence of a conspiracy. Acting in a secretive manner, these three men all were intimately connected to room 116 of the Caravelle Motor Inn. A large quantity of cocaine, drug paraphernalia, and cash were hidden in room 116. Any rational factfinder could conclude on this evidence that a conspiracy to possess and distribute cocaine existed.

#### b. Participation in the Conspiracy

Even if a conspiracy existed, Perlaza and Llanos argue, the evidence is insufficient to show they participated in it.

To convict them, the government must show that Perlaza and Llanos "in some knowing way participated in the conspiracy." *United States v. Mancillas,* 580 F.2d 1301, 1307 (7th Cir.), *cert. denied,* 439 U.S. 958, 99 S.Ct. 361, 58 L.Ed.2d 351 (1978). As defendants point out, it is true that mere presence at, association with, or approval or knowledge of an existing conspiracy is not enough to show participation. *United States v. Dalzotto,* 603 F.2d 642, 645 (7th Cir.), *cert. denied,* 444 U.S. 994, 100 S.Ct. 530, 62 L.Ed.2d 425 (1979); *United States v. Quintana,* 508 F.2d 867, 880–81 (7th Cir.1975). But as we have held previously, "[o]nce a conspiracy is shown to exist[,] evidence that establishes a particular defendant's participation beyond a reasonable doubt, although the connection between defendant and conspiracy is slight, is sufficient to convict." *United States v. Xheka,* 704 F.2d 974, 988 (7th Cir.), *cert. denied,* 464 U.S. 993, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983).

Llanos urges us to consider the evidence against him in a light favorable to himself, arguing that the evidence does not show he was a participant in any conspiracy.

First, Llanos claims his circuitous driving route from his residence to the laundromat could have been a househunting trip instead of an attempt to evade surveillance.

Next, Llanos argues that his placing and receiving several telephone calls from a pay telephone at the laundromat could have been a result of his not having a telephone at his residence, not as a precaution against governmental wiretapping or tracing.

Third, Llanos contends his shaking hands with Marulanda and getting into Marulanda's automobile, which bore no license plates, and then riding around in a curious fashion to the motel does not show participation in a conspiracy. Llanos argues he was merely a passenger in Marulanda's automobile, with no idea whatsoever that Marulanda may have been attempting to elude surveillance on his way to the motel. He claims he knew nothing about the grocery bag in the trunk of the automobile or its contents.

Fourth, Llanos contends that his walk from the automobile toward the motel's pool, while Marulanda was in room 116, was merely a casual stroll to the poolside, rather than a visual check of the area as a lookout.

Finally, Llanos claims his lie to the arresting officers "was only an attempt to avoid arrest" that may have been prompted by the unexpected presence of the police officers with weapons drawn.

In sum, Llanos argues that his "arrest was based on nothing more than his unfortunate location at the time Marulanda committed a crime."

Perhaps viewed in complete isolation from the others, each segment of the scenario could be viewed as Llanos would prefer. But the jury found differently. The jury had evidence before it of Llanos's curious trip to the laundromat, the telephone calls, the trip with Marulanda to the motel, and Llanos's visual check of the motel's parking lot that could support the government's version of the case. This evidence in total was sufficient to prove Llanos was a participant in the conspiracy, and was not merely an innocent bystander to a substantial drug transaction. *See United States v. Perry*, 747 F.2d 1165, 1168–70 (7th Cir. 1984).

Like Llanos, Perlaza too argues that the government's evidence was insufficient to prove he participated in the conspiracy. Perlaza contends that although he registered for room 116, he did so for two people, not just for himself. Moreover, Perlaza points out he did not pay for the room, but the second man did. Perlaza also argues he did not have the key to the room and did not go into the room until the second day when he paid for an additional key. He contends he was not around the motel the afternoon Llanos and Marulanda were arrested and was never in room 116 when drugs were present. Finally, Perlaza argues he voluntarily disclosed the name of the person giving him instructions, William Marulanda, even though Marulanda was the only person arrested with actual possession of any drugs. In short, Perlaza argues that "[t]he facts show no more than a man registering for a motel room in his own name, associating with others who may have been conspirators, and being present at a scene where a crime took place."

The jury, however, was free to draw other inferences from the evidence, and they did so. On appeal, we must view the evidence from which the jury drew its inferences in the light most favorable to the government. Perlaza registered for room 116 in his own name and was seen entering it. He also entered the room the second day and told the maid to leave. She heard him moving the ceiling tiles in the bathroom where the cocaine had been discovered the previous evening.

The evidence is sufficient to show that Perlaza participated in the conspiracy, along with Marulanda and Llanos, to possess and distribute the cocaine.

### 2. Possession with Intent to Distribute Cocaine

■ Perlaza was also charged with possession with an intent to distribute cocaine. The government conceded Perlaza did not have actual possession, but the government argued, and the jury agreed, that Perlaza had constructive possession of the cocaine. In demonstrating constructive possession of cocaine,

> the essential point is that the defendant have the ultimate control over the drugs. He need not have them literally in his hands or on premises that he occupies but he must have the right (not the legal right, but the recognized authority in his criminal milieu) to possess them. . . .

*United States v. Manzella*, 791 F.2d 1263, 1266 (7th Cir.1986).

Perlaza argues that he "never had any conversations about the sale or possession of drugs ... [and that he] rented the room and entered the room several hours before and one day after narcotics were discovered in the room." Perlaza apparently believes these facts show that he did not have the requisite control over the cocaine to be charged with constructive possession.

■ The government's evidence, however, clearly shows Perlaza had the intent and the ability to exercise control over the cocaine. Perlaza registered for the room, entered the bathroom where the cocaine had been hidden, and had a key to the room in his possession when he was arrested.

On this evidence, we are confident in holding the jury rationally could have found Perlaza exercised control over the cocaine and had the intent sufficient to charge him with constructive possession.

### 3. Aiding and Abetting Possession of Cocaine

Llanos was not charged with possession of the cocaine. Rather, the government charged him with aiding and abetting Perlaza's constructive possession and Marulanda's actual possession of the cocaine. As we have previously explained:

> In order to find someone guilty of aiding and abetting a crime, the evidence must demonstrate—according to Judge Learned Hand's formulation, which this circuit has adopted—that the defendant was associated with a criminal venture, that he participated in it as something he wished to bring about and that he sought by his actions to make it succeed.

*United States v. Pope,* 739 F.2d 289, 291 (7th Cir.1984) (referring to *United States v. Peoni,* 100 F.2d 401, 402 (2d Cir.1938)).

Llanos contends that "[a]s in the case of the conspiracy, his mere presence or his association with Marulanda, without more, will not support a finding of guilty."

■ The government, on the other hand, relies on the same evidence to show aiding and abetting that it used to show Llanos was a participant in the conspiracy to possess and distribute cocaine. Llanos was associated with a criminal venture. He drove to the laundromat, placed and received several telephone calls, and then drove to the motel with Marulanda. Marulanda retrieved the hidden cocaine and then brought it back to the automobile in which Llanos was seated.

Not only was Llanos associated with this criminal venture, but he participated in it and sought by his actions to make it succeed. When he drove to the laundromat from his residence, Llanos did so in a manner designed to defeat surveillance. At the laundromat he placed and received several telephone calls from a pay telephone, from which wiretapping and tracing were impossible. At the motel, Llanos got out of Marulanda's automobile to check for any signs of surveillance. And when Llanos was arrested, he lied about his association with Marulanda.

This evidence was sufficient for the jury rationally to conclude that Llanos aided and abetted Marulanda's and Perlaza's possession of the cocaine.

### B. Improper Jury Instruction

Perlaza lastly contends the district judge improperly instructed the jury on the law of actual and constructive possession.

Perlaza argues that the appropriate jury instruction on constructive possession is one found in a form book coauthored by Judge Edward Devitt, of the United States District Court for the District of Minnesota.[3]

The actual instruction given to the jury by the district judge[4] is virtually identical

---

**3.** The "Devitt Instruction" is as follows:

> The law recognizes two kinds of possession: actual possession and constructive possession. A person who knowingly has direct physical control over a thing, at a given time, is then in actual possession of it.
>
> A person who, although not in actual possession, knowingly has both the power and the intention, at a given time, to exercise dominion or control over a thing, either directly or through another person or persons, is then in constructive possession of it.
>
> The law recognizes also that possession may be sole or joint. If one person alone has actual or constructive possession of a thing, possession is sole. If two or more persons share actual or constructive possession of a thing, possession is joint.
>
> You may find that the element of possession as that term is used in these instructions is present if you find beyond reasonable doubt that the defendant had actual or con-

structive possession, either alone or jointly with others.

> An act or a failure to act is "knowingly" done, if done voluntarily and intentionally, and not because of mistake or accident or other innocent reason.

E. Devitt & C. Blackmar, *Federal Jury Practice and Instructions,* § 16.07, at 512–13 (1977).

**4.** The district judge gave this instruction to the jury on the law of constructive possession:

> The law recognizes two kinds of possession: actual possession and constructive possession. A person who knowingly has direct physical control over a thing, at a given time, is then in actual possession of it.
>
> A person who, although not in actual possession, knowingly has both the power and the intention, at a given time, to exercise dominion or control over a thing, either directly or through another person or persons, is then in constructive possession of it.

to Perlaza's preferred "Devitt Instruction." The Devitt Instruction is composed of five paragraphs. The district judge's instruction is a verbatim duplicate of the first three paragraphs and omits the fifth paragraph of the Devitt Instruction. It is the fourth paragraph of the district judge's instruction, which varies slightly from the fourth paragraph of the Devitt Instruction, that troubles Perlaza.

The fourth paragraph of the Devitt Instruction speaks in terms of a single "defendant," while the preceding three paragraphs speak of an abstract "person." The district judge substituted the names of Perlaza and Marulanda for the word "defendant" and mentioned their names parenthetically to explain the element of possession. The district judge then added to the fourth paragraph of the Devitt Instruction two sentences:

> However, you must consider these individuals separately for that purpose. You may not find Mr. Perlaza had actual or constructive possession unless you make that finding beyond a reasonable doubt as to him individually, and not simply as to Mr. Marulanda.

Perlaza claims that "the government's 'amended' version of the Devitt instruction incorporated language so confusing, no jury could reasonably be expected to apply the instruction while considering the evidence." Perlaza also contends that "the repeated linkage of Mr. Perlaza to the only defendant who had actually been in possession of the drugs left the jury with no alternative but to infer Orley Perlaza's guilt on the basis of this 'erroneous' instruction."

■ We disagree. There were only two changes to the instruction preferred by Perlaza. The first change was to substitute Perlaza's and Marulanda's names for the word "defendant." That change was a virtual necessity. Perlaza, Marulanda, and Llanos were all part of the conspiracy. But the government charged only Perlaza and Marulanda, not Llanos, with possession of the cocaine. The word "defendant" in the Devitt Instruction could have confused the jury if it thought it had to find defendant Llanos also possessed the cocaine. Llanos was charged with aiding and abetting the possession, not with possession itself. This small change in the wording of the instruction is not reversible error. *See United States v. Josefik,* 753 F.2d 585, 589 (7th Cir.), *cert. denied,* 471 U.S. 1055, 105 S.Ct. 2117, 85 L.Ed.2d 481 (1985).

■ The second change in the instruction was the addition of two sentences. Perlaza claims these sentences link Perlaza with Marulanda to such an extent that they "left the jury with no alternative but to infer Orley Perlaza's guilt." We are convinced that nearly the opposite is true. The two sentences clearly point out to the jury that it must consider Perlaza and Marulanda separately in its determination of whether Perlaza possessed the cocaine. Moreover, the two sentences explicitly forbid the jury from finding Perlaza had possession of the cocaine merely because Marulanda had possession of it.

Rather than confusing or misleading the jury, these changes in the Devitt Instruction's fourth paragraph clarified to the jury what it was supposed to do. Moreover, this instruction is not only clear and fair when considered alone, but in combination with all the other instructions it is entirely proper.

## IV. CONCLUSION

Perlaza and Llanos challenge their convictions on the basis of insufficient evi-

---

The law recognizes also that possession may be sole or joint. If one person alone has actual or constructive possession of a thing, possession is sole. If two or more persons share actual or constructive possession of a thing, possession is joint.

You may find that the element of possession as that term is used in these instructions is present as to an individual you are considering for that purpose (Orley Perlaza or William Marulanda, as the case may be) if you find beyond a reasonable doubt that Mr. Perlaza or Mr. Marulanda, as the case may be, had actual or constructive possession, either alone or jointly with others. However, you must consider those individuals separately for that purpose. You may not find Mr. Perlaza had actual or constructive possession unless you make that finding beyond a reasonable doubt as to him individually, and not simply as to Mr. Marulanda.

dence. We hold, however, that on the evidence presented the jury rationally concluded the government proved beyond a reasonable doubt each element of each crime charged. Perlaza also challenges his conviction on the basis of an improper jury instruction. Because we conclude the questioned instruction is clear and entirely fair, we hold the instruction is proper. As a result, the judgment of the district court is

AFFIRMED.