UNITED STATES of America, Plaintiff-Appellee,

v.

Olatunji ABAYOMI, Defendant-Appellant.

No. 86–2897.

United States Court of Appeals, Seventh Circuit.

Argued April 15, 1987.

Decided June 4, 1987.

James Holloway, Fed. Defender Program, Chicago, Ill., for defendant-appellant.

Bradley E. Lerman, Asst. U.S. Atty., and Anton R. Valukas, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before WOOD and RIPPLE, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

HARLINGTON WOOD, Jr., Circuit Judge.

The United States charged defendant Olatunji Abayomi with possession of heroin with intent to distribute it and with conspiracy to possess the same in violation of 21 U.S.C. §§ 841(a)(1) & 846 (1982). After a four-day jury trial the jury found Abayomi guilty on the conspiracy charge, but not guilty on the possession charge. Abayomi moved for a new trial and for a judgment of acquittal. The district judge denied the motions and sentenced Abayomi on his conspiracy conviction.[1] Abayomi appeals his conspiracy conviction on the bases of insufficiency of the evidence and an evidentiary ruling. We affirm.

---

1. Abayomi was sentenced to seven years imprisonment to run consecutive to a term of imprisonment imposed on Abayomi's prior state conviction.

## I. BACKGROUND

On May 16, 1985, three envelopes from India arrived at Kennedy Airport in New York City. The envelopes all had return addresses of "The Bible Society, P.O. Box 3455, Anna Negar, West Madras 600040, South India." They were five inches by eight inches in size. The envelopes were all addressed to the same post office box in Chicago, but they each bore the name of a different addressee: (1) "Mr. and Mrs. Thompson-Bathlomein;" (2) "Sister Antonia-Holloway;" and (3) the "Rev. James-John." A customs agent of the United States Customs Mail Facility at the airport inspected the envelopes. Within each envelope, the customs agent found a brown powder that field-tested positive for heroin. The customs agent resealed the envelopes and sent them in a sealed pouch to postal inspectors in Chicago.

The Chicago postal inspectors who received the pouch determined that the post office box to which the envelopes were addressed was located in a post office at 5008 North Sheridan Road in Chicago. This post office box was registered to Oladejo Ibrahim and also listed Akinfenwa-Donus as a recipient of mail.

Postal Inspector Peter Harrison organized a surveillance team to cover the post office. The team included agents from the federal Drug Enforcement Administration (DEA) and the Chicago Police Department. On July 2, 1985, the surveillance team initiated a controlled delivery of the three envelopes. The team arrived at the post office before it opened. They put the three letters in the post office box indicated by the addresses on the envelopes. The team also drilled two peepholes in a door at the back of the post office through which agents could observe any person coming into or going out of the post office. The peepholes also allowed the agents to have an unobstructed view of the post office box under surveillance. Some members of the team waited behind the door in the post office. Others were stationed outside in marked and unmarked automobiles.

Shortly before 2:00 p.m. Postal Inspector Harrison and Special Agent Kevin Lane of the DEA, through the two peepholes in the door, saw defendant Abayomi walk into the post office. Although Abayomi had a separate post office box of his own in the same post office, he walked directly to the box under surveillance. He opened the box with a key, removed the three envelopes and an unrelated fourth piece of mail, and closed the box. Abayomi then walked directly out of the post office. As Abayomi walked out of the post office, Special Agent Nancy Colletti of the DEA came out from behind the back door and followed Abayomi on foot at a distance of five to ten feet. Abayomi walked out of the post office and crossed over Sheridan Road to a brown Pontiac automobile. He climbed into the driver's seat. Akinfenwa-Donus, the person listed as a recipient of mail for the post office box, was sitting in the passenger seat. Abayomi and Akinfenwa-Donus lived in the same apartment building and were acquainted with one another. After Abayomi got into the automobile, he held up the four unopened envelopes. Special Agent Colletti heard both men exclaim, "all right!"

The two men drove away from the post office, going north on Sheridan Road. Special Agent Thomas Kelly of the DEA followed them in an unmarked automobile. Special Agent Kelly saw the passenger lean forward toward the automobile's glove compartment. About one and one-half miles away from the post office, Special Agent Kelly and other law enforcement officers stopped the Pontiac and arrested the two men. Special Agent Kelly searched the Pontiac. He found the three envelopes from India, unopened, hidden under the floor mat on the passenger's side of the automobile. The DEA ultimately determined that the three envelopes from India contained eighty-five grams of 77% pure heroin—amounting to a street value of nearly $1 million.

A fourth envelope was in plain view on the seat between the driver and the passenger. Special Agent Colletti testified Abayomi had, at the time of his arrest, a receipt for certified mail addressed to Abayomi's own post office box, not the one from

which he had just picked up the three heroin-filled envelopes. Postal Inspector Harrison, on the other hand, testified that he watched Abayomi from the time Abayomi entered the post office to the time he left it and that Abayomi went only to the post office box under surveillance and to no others.

Finally, Abayomi's wife testified that she found two opened envelopes in the Pontiac the day after Abayomi was arrested. The Pontiac had not been seized by any law enforcement agents following Abayomi's arrest. Abayomi's wife testified the two envelopes were addressed to Abayomi's own box and contained important forms to obtain college financial aid. The envelopes were postmarked June 28, 1985, four days before Abayomi was arrested. One of them had a return address naming "Federal City Programs" and the other naming "ACT Student Need Analysis Services."

Abayomi appeals his conviction on the bases of insufficiency of the government's evidence and an evidentiary ruling.

In analyzing a challenge to the sufficiency of the government's evidence, "[o]ur standard of review requires that the evidence be viewed in the light most favorable to the government in determining whether 'any rational trier-of-fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Draiman*, 784 F.2d 248, 251 (7th Cir.1986) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)) (emphasis in original); *United States v. Perlaza*, 818 F.2d 1354, 1358 (7th Cir.1987).

In evaluating a district judge's evidentiary rulings, on the other hand, our review is governed by the abuse of discretion standard. *Webb v. City of Chester*, 813 F.2d 824, 827 (7th Cir.1987); *United States v. Buishas*, 791 F.2d 1310, 1313 (7th Cir.1986). "Under the 'abuse of discretion' standard of review, the relevant inquiry is not how the reviewing judges would have ruled if they had been considering the case in the first place, but rather, whether *any* reasonable person could agree with the district court." *Deitchman v. E.R. Squibb &*

*Sons, Inc.*, 740 F.2d 556, 563 (7th Cir.1984) (emphasis in original). In other words, "if reasonable men could differ as to the propriety of the [district] court's action, no abuse of discretion has been shown." *Smith v. Widman Trucking & Excavating, Inc.*, 627 F.2d 792, 796 (7th Cir.1980).

## II.  DISCUSSION

Abayomi asks us to reverse his conviction, or at least grant him a new trial, because the government's evidence against him was insufficient and because the district judge improperly excluded evidence Abayomi believes was favorable to him.

To prove that Abayomi participated in a conspiracy to possess heroin, the government must show two things: (1) that a conspiracy existed and (2) that Abayomi participated in the conspiracy.

"A conspiracy consists of a combination or confederation between two or more persons formed for the purpose of committing, by their joint efforts, a criminal act." *United States v. Hedman*, 630 F.2d 1184, 1192 (7th Cir.1980), *cert. denied*, 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981). The crux of a conspiratorial combination is agreement. "The agreement need not be marked by technical formalities. Indeed, such formalities are typically absent from a conspiratorial agreement because the 'mark of a successful conspiracy is secrecy.'" *United States v. Perlaza*, 818 F.2d 1354, 1358 (7th Cir.1987) (quoting *United States v. Varelli*, 407 F.2d 735, 741 (7th Cir.1969), *cert. denied*, 405 U.S. 1040, 92 S.Ct. 1311, 31 L.Ed.2d 581 (1972)).

Although the evidence against Abayomi is circumstantial, *see United States v. Page*, 580 F.2d 916, 920 (7th Cir.1978) (pointing out that circumstantial evidence is sufficient because "as a practical matter that evidence is often all that exists"), we must look at it, and all reasonable inferences drawn therefrom, in the light most favorable to the government to determine whether any rational factfinder could conclude that a conspiracy existed.

■ One or more persons in India prepared three envelopes to mail to Chicago.

These envelopes were filled with heroin having a value of nearly $1 million. The envelopes bore a return address designated as a bible society. The envelopes were addressed to a husband and wife, a religious "sister," and a reverend. The jury could rationally have concluded these steps were taken to avoid inspection of the contents of the envelopes. The envelopes were mailed to a single post office box in Chicago. Abayomi and his passenger retrieved the envelopes from a locked post office box without attempting to return them as having been addressed improperly. They exclaimed "all right!" at the sight of the unopened envelopes, without actually seeing the contents of any one of them.

This was enough evidence for the government to prove a conspiracy existed, even though some members of the conspiracy were not identified. *Rogers v. United States,* 340 U.S. 367, 375, 71 S.Ct. 438, 443, 95 L.Ed. 344 (1951) ("[O]ne person can be convicted of conspiring with persons whose names are unknown.").

Abayomi contends, however, that even if a conspiracy did exist between the shippers of the heroin in India and the passenger in his automobile, he was not a part of it.

▮ To convict Abayomi, the government must show that he "in some knowing way participated in the [existing] conspiracy." *United States v. Mancillas,* 580 F.2d 1301, 1307 (7th Cir.), *cert. denied,* 439 U.S. 958, 99 S.Ct. 361, 58 L.Ed.2d 351 (1978). It is true that participation cannot be shown by mere knowledge or approval of, association with, or presence at a conspiracy. *United States v. Dalzotto,* 603 F.2d 642, 645 (7th Cir.), *cert. denied,* 444 U.S. 994, 100 S.Ct. 530, 62 L.Ed.2d 425 (1979); *United States v. Quintana,* 508 F.2d 867, 880–81 (7th Cir.1975). But "[o]nce a conspiracy is shown to exist[,] evidence that establishes a particular defendant's participation beyond a reasonable doubt, although the connection between defendant and conspiracy is slight, is sufficient to convict." *United States v. Xheka,* 704 F.2d 974, 988 (7th Cir.), *cert. denied,* 464 U.S. 993, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983).

Abayomi argues that "[a] relationship between Abayomi and a conspirator (Akinfenwa-Donus) was essentially all that was presented by the government to prove Abayomi's participation in the conspiracy." Abayomi asks us to view the evidence in a fragmented fashion, drawing inferences in his favor.

Abayomi attempts to paint a picture very different from the one portrayed by the government. In essence, he claims he was innocently running an errand. The evidence shows Abayomi had his own post office box in the same post office as his passenger. Abayomi claims he and his passenger drove together to the post office to get their own mail from both boxes. Abayomi points out that a post office is not an inherently suspicious location for drug dealing or other illegal activity. In addition to retrieving the college aid forms from his own post office box, Abayomi alleges, he picked up the mail for his passenger from his passenger's box. Abayomi contends he returned to the Pontiac unsuspiciously—he walked out of the post office without looking behind him or from side to side and he allowed a DEA agent to follow him closely. Abayomi then showed his passenger the envelopes he claims he retrieved from his own box. They allegedly contained financial aid forms. Excited about the possibility of receiving financial aid for college, Abayomi claims, he and his passenger uttered the words "all right." As he was driving away from the post office, Abayomi contends his attention was on his driving, not on his passenger, who may have been placing three of the four envelopes under the floor mat.

Perhaps each part of the picture could be viewed as Abayomi asks us to do. But as we have previously noted,

> it is also imperative that we not rend the fabric of evidence and examine each shred in isolation; rather, the reviewing court "must use its experience with people and events in weighing the chances that the evidence correctly points to guilt against the possibility of [inaccurate] or ambiguous inference...."

*United States v. Redwine,* 715 F.2d 315, 319 (7th Cir.1983) (quoting *United States v. Kwitek,* 467 F.2d 1222, 1226 (7th Cir.), *cert. denied,* 409 U.S. 1079, 93 S.Ct. 702, 34 L.Ed.2d 668 (1972)), *cert. denied,* 467 U.S. 1216, 104 S.Ct. 2661, 81 L.Ed.2d 367 (1984). The jury rationally could have found that Abayomi did not go to his own box to pick up financial aid forms and then got caught as an innocent bystander in a drug conspiracy. Rather, the jury could have concluded, and it did, that Abayomi went only to his passenger's box to pick up the heroin both he and his passenger were expecting. *See United States v. Perlaza,* 818 F.2d 1354, 1360 (7th Cir.1987); *United States v. Perry,* 747 F.2d 1165, 1168–70 (7th Cir. 1984). The testimony of the agents who watched Abayomi through the two peepholes, the agent who followed Abayomi to the Pontiac, the agent who tailed Abayomi as he drove away from the post office, and the agents who detained and searched the Pontiac when Abayomi was arrested provided enough evidence for the jury rationally to conclude that Abayomi participated in the conspiracy.

Abayomi also complains, however, that his conviction on the conspiracy charge is inconsistent with his acquittal on the possession charge and therefore cannot stand. In other words, Abayomi argues that because he was acquitted on the underlying possession charge, he cannot be convicted on the derivative charge of conspiracy to possess.

It is well settled, however, that "[c]onsistency in the verdict is not necessary. Each count in an indictment is regarded as if it was a separate indictment." *Dunn v. United States,* 284 U.S. 390, 393, 52 S.Ct. 189, 190, 76 L.Ed. 356 (1932); *United States v. Powell,* 469 U.S. 57, 64, 105 S.Ct. 471, 476, 83 L.Ed.2d 461 (1984); *United States v. Isaksson,* 744 F.2d 574, 579 (7th Cir.1984) ("The policy consideration underlying this rule is that a jury may acquit on some counts and convict on others not because they are unconvinced of guilt, but because of compassion or compromise."). The fact that Abayomi was acquitted on the possession charge does not detract from his conviction on the conspiracy

charge. The government presented evidence sufficient to show that Abayomi participated in a conspiracy, irrespective of what some of that same evidence may or may not have shown with respect to possession alone.

■ Abayomi also challenges his conviction on the basis of an allegedly improper evidentiary ruling by the district judge. Special Agent Lane testified at trial about the existence of the two peepholes that had been drilled in the door in the post office. He also described how he and Postal Inspector Harrison had observed Abayomi through the two peepholes. In an attempt to impeach Special Agent Lane's testimony, Abayomi's counsel showed Special Agent Lane a number of photographs. Special Agent Lane identified the photographs as pictures of the door at the back of the post office. But when asked to indicate on any one of the photographs the second peephole through which he had observed Abayomi, Special Agent Lane had the following colloquy with Abayomi's counsel:

> [Abayomi's Counsel] I'd like you to take a look at Defendant's Exhibit 1Q, 1L, 2D, 2E, 1K, and 1M. On any of these exhibits, would you place a circle where that second hole is. Point it out to the jury and place a circle where that second peephole is in any of those photographs.
>
> [Special Agent Lane] From my knowledge or from these photos?
>
> Q From the photos.
>
> A From these photos, I can't circle it.
>
> Q There is no second peephole on these photos, is there?
>
> A On these photographs outside of the door that you can see, no.

Abayomi's counsel then concluded his cross-examination of Special Agent Lane and asked the district judge to admit the photographs into evidence. The government objected and a side bar conference ensued. Abayomi's counsel argued at side bar that a proper foundation had been laid for admitting the photographs because Special Agent Lane had testified they were pictures of the door at the back of the post

office. But the district judge, who heard the testimony, explained:

Now, if those photographs were blown up and if you were going to portray the particular point in the door, then there would be a question of fact of whether there is a hole in the door, a crack in the door and so forth. But, if the pictures misleads [sic] or confuses [sic] as they may, then I have some problem with letting the jury see them. If you have blowups or something of that nature, it is different. If they are offered to show [the] facility, there is no issue—or the existence of the door. But, when you're talking about a hole that may be a quarter of an inch in diameter, which is part of a seam to use that witness' expression, in the door, the tendency is to mislead or confuse as opposed to aid the jury in determining the existence of the second hole in the door.

The district judge ultimately excluded the photographs "essentially on the basis that they are, in effect, aerial views of a gnat's eye."

Abayomi complains that the district judge's ruling was improper. He contends: "The court's ruling was tantamount to a holding that because the photographs did not somehow *corroborate* Agent Lane's depiction of events, they would confuse a jury!" We disagree.

"A district court has broad discretion when assessing the admissibility of proffered evidence and we may reverse its rulings only after we are convinced that the court abused its discretion." *United States v. Latham,* 754 F.2d 747, 751 (7th Cir.1985). Abayomi submitted photographs without properly establishing a foundation for them. Special Agent Lane did not authenticate them—in fact, he said in so many words that they did not accurately portray the door at the post office. Abayomi did not call the photographer to the stand to testify that the photographs fairly portrayed the door. Neither did Abayomi call any other witness to establish a proper foundation for the photographs. The district judge did not abuse his broad discretion in deciding to exclude photo-

graphs for which no foundation had been established. In fact, the district judge went so far as to encourage Abayomi's counsel to take advantage of every conceivable opportunity to establish a foundation for the photographs, including physically transporting the door to the courtroom. The district judge explained both his concern about the lack of foundation and his willingness to allow Abayomi to establish the foundation:

[T]he essence of [Special Agent Lane's] testimony is that he cannot tell from his photographs whether they represent the hole that he claims he looked through.

He has testified as to the existence, and what he is saying, in essence, is that these photographs don't portray it, and he has said from looking at those photographs that that is the problem—the photograph itself.

If you want an opportunity to present an additional witness or go out there and take additional photographs or something of that nature, I will continue the case to give you an opportunity to do so. If the condition of that door has not changed since the date of this event, I'll grant a continuance for you and the Government to go out there with the appropriate photographic equipment and take pictures of the door, and I will go a step further. If you want to have that door brought into this courtroom, I'll allow you to do so, and I'll enter an order to that effect; but in the present condition, I think those photographs might mislead or confuse the jury.

I'm concerned about the issue, but if you want an opportunity to have that door physically put in here, I'll allow the opportunity and grant the continuance to give you time to do it.

Far from abusing his discretion, the district judge gave Abayomi every reasonable opportunity to properly establish a foundation for his photographs. Even if the district judge had admitted the photographs and the jury had drawn some impeachment inferences from the inability to see a second peephole, it would have been of little benefit to Abayomi.

In a final effort to convince us to reverse his conviction, Abayomi characterizes the

district judge's refusal to admit the photographs as a violation of Abayomi's constitutional rights, rather than an evidentiary ruling. Presumably, this is an attempt to skirt the abuse of discretion standard of review. If indeed a constitutional right is implicated in excluding the photographs, then our standard of review is *de novo*, rather than abuse of discretion. *United States v. Gentile*, 816 F.2d 1157, 1161 (7th Cir.1987). Abayomi argues: "Concomitant to an accused's Sixth Amendment right to confront witnesses against him is the right to present evidence in his own behalf, or to have 'compulsory process.' ... Here, the trial judge's actions denied Mr. Abayomi the right to have compulsory process for presenting evidence in his favor because it precluded him from presenting his full case to the jury."

The district judge allowed Abayomi every opportunity to establish a foundation for his photographs. Abayomi did not avail himself of those opportunities. He now belatedly attempts to recharacterize an evidentiary decision as a constitutional issue, which it is not.

Therefore, the judgment of the district court is

AFFIRMED.