UNITED STATES of America,
Plaintiff–Appellee,

v.

Dusan LAKICH, Defendant–Appellant.

No. 92–4122.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 10, 1993.

Decided May 6, 1994.

Lance C. Malina, Asst. U.S. Atty. (argued), Crim. Div., Barry R. Elden, Asst. U.S. Atty., Crim. Receiving, Appellate Div., Chicago, IL, for plaintiff-appellee.

David S. Mejia, Oak Park, IL (argued), E. Barry Greenberg, Greenberg & Associates, Oakbrook Terrace, IL, for defendant-appellant.

Before GIBSON,* COFFEY, and RIPPLE, Circuit Judges.

COFFEY, Circuit Judge.

Dusan Lakich ("Lakich") was indicted along with his co-defendant, Jose M. Huertas–Santiago ("Santiago") on one count of conspiring to possess with intent to distribute one kilogram of cocaine in violation of 21 U.S.C. § 846, and one count of possessing with intent to distribute one kilogram of cocaine in violation of 21 U.S.C. § 841(a)(1).

---

* The Honorable Floyd R. Gibson of the United States Court of Appeals for the Eighth Circuit is sitting by designation.

Following a jury trial, co-defendant Santiago was acquitted on both counts while Lakich was acquitted on Count I (conspiracy) and convicted on Count II (possession with intent to distribute). He was sentenced to five years' imprisonment, to be followed by four years of supervised release, and ordered to pay a special assessment of $50.00.

On appeal, the defendant seeks a new trial on the grounds that the trial court's supplemental instruction on the issue of entrapment constituted plain error.

## BACKGROUND

On the evening of June 24, 1992, Lakich called Steven Gligorovic ("Gligorovic"), a confidential informant ("CI") for the Cook County, Illinois Countryside Police Department, and stated that he could get Gligorovic as much cocaine as he needed. Gligorovic responded that he knew of another person named "Dan" who could make purchases of cocaine at any time. Unbeknownst to Lakich, the "Dan" Gligorovic was referring to was one Patrick Humes ("Humes"), a Drug Enforcement Administration ("DEA") agent. The following evening Lakich called again and agreed to meet with Gligorovic and "Dan" at 11:30 a.m. the following morning to sell a kilo of cocaine for $28,000. He stated that a man named "Jose" would bring the cocaine to the sale site. On the morning of June 26 the defendant Lakich arrived at Gligorovic's house and confirmed the drug deal, and thereafter Gligorovic contacted the DEA.

Gligorovic with Agent Humes (wired with a hidden recording device and posing as the buyer) drove to the agreed location and met Lakich waiting in his truck. Agent Humes gave Lakich the $28,000 and observed him count the money. At this time, Lakich suggested to Humes that they consummate the drug deal at another address.

While Agent Humes and Gligorovic drove to the selected location, Lakich was observed by other agents speaking with the co-defendant Santiago. Lakich then drove to the agreed sale site, motioned for Gligorovic to come to his truck, and instructed him to direct Agent Humes to follow. Humes suggested to Gligorovic that he remain behind while he followed Lakich in his car for about a block, whereupon the defendant pulled over and parked. Shortly thereafter, Santiago drove up in a white Chevy Astro mini van, rolled down his window and said he had to go "pick it up" and would return.

When Santiago returned, Lakich and Humes entered his Chevy mini van. Lakich handed a kilo of cocaine to Agent Humes to inspect while Santiago drove them around the block. Santiago parked the vehicle, Agent Humes exited the van and gave a prearranged arrest signal. DEA agents closed in and arrested both Lakich and Santiago.

### Trial Proceedings

At trial, Lakich raised the defense of entrapment and told the jury quite a story. In his testimony he denied that he was a cocaine dealer and claimed that he had been induced by Gligorovic to *pose* as one in order that he might convince Gligorovic's buyer that the price of a kilo of cocaine had increased from its usual price of $25,500–$26,000 to $28,000. According to the defendant Lakich, Gligorovic explained to him that this was a higher price than he usually charged this buyer, and that he needed someone, in this instance Lakich, to pose as his supplier and "confirm" the higher price in order to alleviate any suspicions the buyer might have that he was being overcharged. According to Lakich, in return for his help, Gligorovic allegedly promised to repay Lakich part of the same $4,000 that Lakich stated he had allegedly previously loaned him. According to Lakich, he had loaned this money to Gligorovic after Gligorovic had supposedly told him that he feared for his life and needed the funds in order to settle a prior debt with his drug suppliers.

Lakich in his testimony also recounted that Gligorovic had allegedly advised him on how to talk and act like a real drug dealer. Lakich also claimed that the kilo of cocaine (worth some $28,000) originally came from Gligorovic, who supposedly had left it under a garbage dumpster unguarded near a nearby McDonald's restaurant for Lakich to pick up. Lakich stated that he retrieved the coke

as directed and delivered it to Santiago. Lakich promised to pay Santiago $500 if he would temporarily hold the drug and bring it to the sale site.

At trial, Lakich admitted to having counted out the $28,000 he received from Agent Humes, but testified that he had only done so pursuant to Gligorovic's instructions. Similarly, Lakich also testified that the numerous narcotics-related discussions he had had with Agent Humes (and which Humes had secretly recorded), were the result of Gligorovic having suggested to him that he "act like a drug dealer." Gligorovic, on the other hand, testified for the government and flatly contradicted Lakich's account. According to Gligorovic, Lakich contacted him on his own, offered to sell a kilo of cocaine, and proceeded to instruct him in how to set up the drug deal. On cross-examination, Gligorovic specifically denied having ever borrowed money from Lakich and denied having asked Lakich to "pose" as a drug dealer in order to convince his customer that the price of cocaine had increased.

At the jury instruction conference, the government, relying on *United States v. Evans*, 924 F.2d 714 (7th Cir.1991), initially filed a motion to preclude an entrapment instruction on the ground that, even if one were to believe Lakich, no reasonable jury could find that the CI had provided him with an "extraordinary inducement" to commit a crime. The trial judge denied the government's motion, and instructed the jury without objection that:

> "If Defendant Lakich had no prior intent or predisposition to commit the offense charged, and was induced or persuaded to do so by law enforcement officers or their agents, then he was entrapped.... In determining whether Defendant Lakich had a prior intent or predisposition to commit the offense charged, you may consider his personal background as well as the nature and degree of any inducement or persuasion of Defendant Lakich by law enforcement officers or their agents. When a person accepts a criminal offer without being offered extraordinary inducements, he demonstrates his predisposition to commit the type of crime involved."

The district court further instructed the jury without objection regarding the effect of there being multiple defendants and multiple counts (hereinafter the "multiple defendant/multiple count instruction"):

> "Each count of the indictment charges each defendant named in that count with having committed a separate offense.
>
> You must give separate consideration both to each count and to each defendant. You must consider each count and the evidence relating to it separate and apart from every other count.
>
> You should return a separate verdict as to each defendant and as to each count. Your verdict of guilty or not guilty of an offense charged in one count should not control your decision as to that defendant under any other count."

After two days of deliberations, the jury asked a question of the judge: "If we find the defendant not guilty on Count I due to entrapment, does the same entrapment reflect on Count II? Please define extraordinary inducement." Before responding to the jurors' question, the trial judge consulted the attorneys to obtain their approval of the supplemental instruction he intended to give.

We agree the term "extraordinary inducement" might not be as clear and definitive as we would like it to be, but neither side disputes that the district court gave an appropriate supplemental instruction defining extraordinary inducement ("An extraordinary inducement is one that might entice an otherwise law abiding person to commit a crime"). In response to the first part of the jury's question—whether a finding of entrapment on Count I would "reflect" on Count II—the trial court directed the jury to refer back and follow the multiple defendant/multiple count instruction in conjunction with the supplemental instruction he was about to give: "Some evidence may relate to more than one count. Still, you must give separate consideration to each count, considering only the evidence that relates to that count." Before giving this supplemental instruction, the judge asked the government if it agreed with the proposed response, and the prosecutor

replied it agreed, as did Lakich's counsel, who stated: "I would agree to that," as did counsel for co-defendant Santiago.

The jury returned to its deliberations and ultimately acquitted co-defendant Santiago of both counts and found Lakich "not guilty" as to Count I (the conspiracy count) and guilty as to Count II (possession with intent to distribute cocaine).

## ISSUE

The issue is whether the trial judge committed reversible error when it gave the supplemental instruction on entrapment as approved by respective counsel.

## DISCUSSION

In spite of Lakich's specific agreement to the supplemental instruction, he somehow now finds cause to object. It is obvious that because he agreed to the supplemental instruction, he was in no position to enter an objection during trial. When this failure to object was pointed out to Lakich's counsel at oral argument, he conceded that there was indeed "a waiver problem," but proceeded to contend that a new trial is nevertheless warranted on the grounds that the trial judge's supplemental instruction was "plain error."

### A.

■ We note at the outset that we may correct serious trial errors affecting substantial rights despite the defendant's failure to object. Fed.R.Crim.P. 52(b). But this "Plain Error Rule" may only be invoked in instances of "forfeited-but-reversible error," *United States v. Olano,* — U.S. —, —, 113 S.Ct. 1770, 1776, 123 L.Ed.2d 508 (1993), and cannot be used for the purpose of revoking an otherwise valid waiver. This is so because if there has been a valid waiver, there is no "error" for us to correct. *See Olano,* — U.S. at —, 113 S.Ct. at 1777. As we have observed before, "[t]he 'error' contemplated by *Olano* is 'deviation from a legal rule,' *unless* the rule has been waived." *United States v. Davis,* 15 F.3d 1393, 1407 (7th Cir.1994) (citing *Olano,* — U.S. at —, 113 S.Ct. at 1777) (emphasis added).

■ The distinction between a forfeiture of a right (to which the Plain Error Rule may be applied) and a waiver of that right (to which the Plain Error Rule cannot be applied) is that "[w]hereas forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.'" *Olano,* — U.S. at —, 113 S.Ct. at 1777 (citations omitted). This court has held that under Federal Rule of Criminal Procedure 30 "a party may not raise an error or omission in a jury instruction unless the party timely objected and 'state[d] distinctly the matter to which that party objects and the grounds of the objection.'" *United States v. Starnes,* 14 F.3d 1207, 1213 (7th Cir.1994) (defense counsel stated that he had "[n]o objections to the instructions as they will be given"). It is well-settled that in the absence of a proper objection, the mere submission of "[a jury] instruction is insufficient to preserve the right to appeal." *United States v. Bullock,* 857 F.2d 367, 371 (7th Cir.1988) (citing *United States v. Douglas,* 818 F.2d 1317, 1320 (7th Cir.1987); *United States v. Brown,* 739 F.2d 1136, 1143 (7th Cir.1984); *cert. denied,* 469 U.S. 933, 469 U.S. 933, 105 S.Ct. 331, 83 L.Ed.2d 268 (1984); *United States v. Jackson,* 569 F.2d 1003, 1009–10 (7th Cir.1978), *cert. denied,* 437 U.S. 907, 98 S.Ct. 3096, 57 L.Ed.2d 1137 (1978)).

■ . Moreover, the transcript discloses that Lakich's trial decision to explicitly approve the supplemental instruction he now challenges was knowingly made. The trial judge read counsel the jury note (asking whether a finding of entrapment on Count I would "reflect" on Count II). He then excused the jury and suggested to counsel that they "think about what you want to say," and return the following morning with their responses. Obviously the trial judge was giving the attorneys overnight to think about the question and certainly gave counsel ample time to digest and research the law on the issue.

The following morning the judge elicited responses from counsel concerning the juror's question. Lakich's attorney initially urged the court to issue a one-word "yes" response to the question whether a finding of

entrapment on Count I would "reflect" on Count II. The government, on the other hand, suggested that the court simply refer the jury to the multiple defendant/multiple count instruction given previously in the instructions and nothing more. The court, after listening to arguments pro and con, said, "Let me propose this response to you," and read counsel the supplemental instruction at issue in this case. Respective counsel each agreed to this instruction.

Since Lakich's attorney stated "I would agree to" the court's supplemental instruction he was in no position to object; thus we hold that the defendant waived any objections and his request for analysis under the Plain Error standard is rejected. *Olano,* ___ U.S. at ___, 113 S.Ct. at 1776.

### B.

We also point out that even if we were to apply the Plain Error analysis, the defendant's argument would fail because the law governing the court's broad discretion in responding to juror questions is well-settled:

> " 'The necessity, extent, and character of any supplemental instructions to the jury are matters within the discretion of the district court.' *United States v. Franco,* 874 F.2d 1136, 1143 (7th Cir.1989) (quoting *United States v. Castenada,* 555 F.2d 605, 611 (7th Cir.), *cert. denied,* 434 U.S. 847, 98 S.Ct. 152, 54 L.Ed.2d 113 (1977)). 'Once it is clear that a jury has difficulties concerning the original instructions, reinstruction is appropriate.' *United States v. Cheek,* 882 F.2d 1263, 1268 (7th Cir.1989), *vacated on other grounds,* 498 U.S. 192, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991); [*United States v.] Beverly,* 913 F.2d [337] at 357 [ (7th Cir.1990) ]. The court's power to reinstruct includes within it the power to reformulate or supplement the instruction. *See Franco,* 874 F.2d at 1143; *United States v. Penson,* 896 F.2d 1087, 1090 (7th Cir.1990) ('substantial discretion is given to the trial court with respect to the specific wording of the instructions'). Among the factors to be examined when determining if a supplemental instruction was an appropriate exercise of the district court's discretion are (1) if the instructions as a whole fairly and adequately treat the issues; (2) whether the instructions are a correct statement of the law; and (3) whether the district court answered the jury's question specifically. *Franco,* 874 F.2d at 1143; *Cheek,* 882 F.2d at 1268. 'It is axiomatic that in determining the propriety of an instruction that all the instructions be considered as a whole.' *United States v. Johnson,* 605 F.2d 1025, 1027 (7th Cir.1979) (*en banc*), *cert. denied,* 444 U.S. 1033, 100 S.Ct. 706, 62 L.Ed.2d 670 (1980)."

*United States v. Sanders,* 962 F.2d 660, 677 (7th Cir.), *cert. denied,* ___ U.S. ___, 113 S.Ct. 262, 121 L.Ed.2d 192 (1992).

■ We are of the opinion that the court's initial and supplemental jury instructions, when viewed as a whole and not in isolation, fairly and adequately treated the entrapment issue. "Where the government has induced an individual to break the law and the defense of entrapment is at issue ... the prosecution must prove beyond reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by government agents." *United States v. Olson,* 978 F.2d 1472, 1483 (7th Cir.1992) (quoting *Jacobson v. United States,* ___ U.S. ___, ___, 112 S.Ct. 1535, 1540, 118 L.Ed.2d 174 (1992)), *cert. denied,* ___ U.S. ___, 113 S.Ct. 1614, 123 L.Ed.2d 174 (1993). A defendant cannot establish that he was entrapped merely by demonstrating that a government agent solicited him or provided him with an opportunity to commit the crime. *United States v. Cervante,* 958 F.2d 175, 179 (7th Cir.1992). It is well-settled that, to prevail on a defense of entrapment:

> " '[T]he defendant must bring forward evidence both that he was induced by the government to commit the crime and that he was not predisposed to engage in the criminal conduct.' *United States v. Sanders,* 962 F.2d 660, 679 (7th Cir.), *cert. denied,* ___ U.S. ___, 113 S.Ct. 262, 121 L.Ed.2d 192 (1992). It is only when the defendant has established both inducement and lack of predisposition that the burden shifts to the government to disprove entrapment. *United States v. Cervante,* 958 F.2d 175, 178 (7th Cir.1992). 'The entrap-

ment analysis ends without inquiry into inducement if the defendant was predisposed to commit the charged conduct. *A predisposed individual is one who is prepared and eager for the opportunity to commit a crime.' Id.*"

*Starnes,* 14 F.3d at 1212–13 (emphasis added).

Moreover, this court has held that:

"A person who takes advantage of an ordinary opportunity to commit criminal acts—not an extraordinary opportunity, the sort of thing that might entice an otherwise law-abiding person—is not entrapped. *Such a person is predisposed to commit the crime* in the sense that the ordinary profits of crime are incentive enough to him to commit crimes; he is ready and waiting; all that is wanting is the opportunity."

*Evans,* 924 F.2d at 717 (emphasis added).

We are of the opinion that the evidence in this case (which we will discuss, *infra*) overwhelmingly demonstrated the defendant's predisposition to traffick in drugs, and that therefore not only was the jury justified in finding that Lakich was not entrapped into possessing cocaine with intent to distribute, but we are not sure that we would agree with the trial judge that the defense satisfied the requirement of offering sufficient evidence to merit the giving of an entrapment instruction.

Nevertheless, having determined to give an entrapment instruction on a very close call, the trial court, relying on *Evans,* properly instructed the jury that, "When a person accepts a criminal offer without being offered extraordinary inducements, he demonstrates his predisposition to commit the type of crime involved" and thus has not been entrapped. Because it is the jury's duty as the fact-finder to determine whether the evidence offered by the defendant was sufficient to support a finding of entrapment, we believe the trial judge was appropriately cautious in formulating a response to the jurors' subsequent question regarding whether a finding of entrapment on one count "reflected" on the other count. As the Ninth Circuit has noted:

"[T]he trial court faces a difficult task in attempting to respond to a jury's communication. A trial judge is often reluctant to respond to questions in language similar to that used by the jury, *particularly where inquiries are phrased as hypothetical cases or as questions requiring a categorical yes or no answer. . . .* Because the jury may not enlist the court as its partner in the fact-finding process, the trial judge must proceed circumspectly in responding to inquiries from the jury. The court may properly attempt to avoid intrusion on the jury's deliberations by framing responses in terms of supplemental instructions rather than following precisely the form of question asked by the jury."

*United States v. Walker,* 575 F.2d 209, 214 (9th Cir.) (emphasis added), *cert. denied,* 439 U.S. 931, 99 S.Ct. 320, 58 L.Ed.2d 325 (1978).

We have no doubt that if the trial judge had responded with a simple affirmative answer to the question whether evidence of entrapment on one count "reflected" on a separate count, he would have risked intruding on the jury's fact-finding regarding whether Lakich had established an entrapment defense to either or both counts. In contrast, the supplemental instruction the court issued advisedly informed the jury that (1) it had a duty to give separate consideration to each count, *and* that (2) "some evidence may relate to more than one count." We are at a loss to understand how the defendant can insist that this instruction somehow "mechanically told the jury that the law of entrapment on Count II was different than the law of entrapment on Count I."

Whether a defendant was predisposed to commit the crime is for the finder of fact to decide, thus we will affirm if "any rational trier of fact" could have found that the defendant was predisposed to commit the crime beyond a reasonable doubt. *United States v. Carrasco,* 887 F.2d 794, 814 (7th Cir.1989) (quoting *United States v. Perez–Leon,* 757 F.2d 866, 871 (1985)). In making this determination, the jury was entitled to consider the defendant's personal background "to determine where he sits on the continuum between naive first offender and streetwise" criminal. *United States v. Town-*

*send*, 555 F.2d 152, 155 n. 3 (7th Cir.) (citing *Sherman v. United States*, 356 U.S. 369, 371–373, 78 S.Ct. 819, 820–821, 2 L.Ed.2d 848 (1958)), *cert. denied*, 434 U.S. 897, 98 S.Ct. 277, 54 L.Ed.2d 184 (1977). See also *Federal Judicial Center, Pattern Criminal Jury Instructions* at 7–38 (1987).

██ Our review of the record discloses substantial evidence that Lakich was far from being a naive first offender who was somehow entrapped into selling $28,000 worth of cocaine, and that the defendant was experienced and sophisticated in the ways of the drug world. There is ample evidence in the record that the defendant Lakich was eager, ready, willing and able to participate in the crime for which he was convicted, i.e., possession with intent to distribute cocaine. In rejecting the defendant's entrapment defense to this charge, the jury may well have considered (1) that Gligorovic testified and outright denied and controverted Lakich's testimony; (2) that because (as Gligorovic testified) Lakich never loaned Gligorovic any money, let alone $4,000, Gligorovic never promised to repay some of the alleged loan in return for Lakich's agreement to sell cocaine to Agent Humes, for Gligorovic owed Lakich nothing; (3) that instead it was the defendant who initiated the first contact with Gligorovic on his *own* initiative and called him to ask whether Gligorovic knew if other known drug dealers would be interested in buying cocaine, and that Gligorovic responded that he knew of a person who could buy two kilograms; (4) that thereafter Lakich subsequently called Gligorovic a second time to offer to sell a single kilogram of cocaine (and presumably set the price at $28,000); (5) that Lakich selected the site of the sale; (6) that Agent Humes brought $28,000 in $100 bills and that Lakich counted every bill; (7) that Lakich was observed speaking to Santiago before the sale and that Gligorovic testified that he had never met or seen Santiago before; (8) that the defendant, who was either a very fast learner in the accelerated class or picked up the nuances of the drug world through experience, demonstrated his knowledge of how to conduct a drug deal by taking elaborate precautions which included directing the others to three different locations before finally having a third person (Santiago) deliver the cocaine to him at the last minute; (9) that Lakich personally handed the cocaine to Agent Humes to inspect while Santiago was driving them around the block in his van; (10) that the defendant promised to pay Santiago $500 for delivering the cocaine to the sale site; (11) that in his recorded conversations with Agent Humes, which were played for the jury, Lakich spoke knowledgeably about the illegal drug trade; and (12) that the defendant patted Humes to determine whether he was "wired" as well as inquired if he was "wired." In sum, while the defendant described himself as an average hard-working truck driver, his actions belie this fact and suggest that he had considerable experience in, and knowledge of, the drug trade.

We are also convinced that any reasonable jury would be more than justified in rejecting the defendant's testimony as patently unbelievable. The record discloses that, in attempting to establish that he was entrapped into selling Agent Humes a kilo of cocaine, Lakich according to his testimony was asking the jury to believe that (1) he had previously lent $4,000 (his life savings) to Gligorovic, a drug dealer he had known for only three months; (2) that rather than giving him the cocaine valued at $28,000, Gligorovic left it under a dumpster unguarded at McDonald's for an unknown length of time for Lakich to pick up; and (3) that it was Gligorovic's idea that Lakich deliver the $28,000 worth of cocaine to Santiago to retain and later bring to the drug sale even though Gligorovic did not even know him and in fact had never seen him much less ever talked to him.

The question of whether the defendant was entrapped based on the initial instruction on entrapment and the supplemental instruction was a question of credibility. And the jury in all probability determined Lakich's story was nothing but a fantasized fabrication and unbelievable. In rejecting the defendant's entrapment defense to Count II, the jury obviously believed that the government's witnesses were truthful and that Lakich's tale failed to even resemble the truth. As an appellate court, we will not second-guess the jury on this matter, which was best resolved

"through giving the judge or jury the opportunity to observe the verbal and nonverbal behavior of the witnesses focusing on the subject's reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture and body movements, rather than looking at the cold pages [of a transcript]."

*Churchill v. Waters,* 977 F.2d 1114, 1124 (7th Cir.1992), *cert. granted,* — U.S. ——, 113 S.Ct. 2991, 125 L.Ed.2d 686 (1993).

As in *Carrasco,* our review of the record persuades us that "[t]he evidence, when viewed in the light most favorable to the government, was clearly sufficient for a rational fact-finder to conclude that [the defendant] was ready, willing, able and certainly not reluctant to engage in these transactions." *Carrasco,* 887 F.2d at 815.

■■■ Finally, we observe that to warrant relief under the Plain Error doctrine a defendant must establish that he was prejudiced by the alleged error. *Olano,* — U.S. ——, 113 S.Ct. at 1770. In an attempt to demonstrate that he was prejudiced, Lakich points to the jury's split verdict and contends that if the court had instructed the jury that a finding of entrapment on Count I "related" to Count II, he would have been acquitted of both counts rather than just one. But Lakich's theory is pure speculation because it is "impossible to determine which party has been prejudiced" by a split verdict. *United States v. Scop,* 940 F.2d 1004, 1007 (7th Cir.1991). In *United States v. Campbell,* 985 F.2d 341, 345 (7th Cir.1993), we explained that, in accordance with the Supreme Court's decision in *United States v. Powell,* 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984):

"[E]ach count in an indictment is to be treated as a separate indictment and an acquittal on one count does not dictate an acquittal on any other count. [citing *United States v. Brown,* 934 F.2d 886, 889 (7th Cir.1991) ]. When a jury returns inconsistent verdicts, we explained, it may do so for reasons other than a determination of innocence, such as mistake, compromise, or lenity. *Id.* See also *United States v. Abayomi,* 820 F.2d 902, 907 (7th Cir.), *cert.*

*denied,* 484 U.S. 866, 108 S.Ct. 189, 98 L.Ed.2d 142 (1987)."
*Campbell,* 985 F.2d at 345–46.

Therefore, relying on *Campbell,* there is nothing but speculation to support the defendant's assumption that were it not for the court's supplemental instruction the jury would have been compelled to acquit him of both counts rather than just one, for it is at least equally likely that the jury would have felt no choice but to *convict* him of both counts, rather than just one.

In any event, we reject the defendant's unfounded characterization of the split verdict as inconsistent and "inexplicable." The jury's "not guilty" verdict on the conspiracy count, for example, might well have been a result of its finding that Lakich was *solely* responsible for the cocaine sale and that they believed Santiago as contrasted with their disbelief of Lakich. The jury thus may have found that Lakich had not conspired with codefendant Santiago, who was acquitted on both counts, and believed that Santiago was a mere dupe. Or, alternatively, as the government argues, even assuming for the sake of argument that the jury did accept Lakich's entrapment defense to the conspiracy count, it still could have found that he was not entrapped as to the substantive crime of possessing cocaine with intent to distribute.

For these reasons we believe there is no basis for assuming that the split verdict in this case was "inconsistent," but we point out that even if it had been inconsistent, our Supreme Court, after noting that inconsistent verdicts "often are a product of jury lenity," has rejected as "imprudent and unworkable" a rule permitting criminal defendants "to challenge inconsistent verdicts on the ground that the verdict was not the product of lenity, but of some error that worked against them." *Powell,* 469 U.S. at 66, 105 S.Ct. at 477. As the Court explained:

"Such an individualized assessment of the reason for the inconsistency would be based either on pure speculation, or would require inquiries into the jury's deliberations that courts generally will not undertake.... Courts have always resisted inquiring into a jury's thought processes [citations omitted]; through this deference

the jury brings to the criminal process, in addition to the collective judgment of the community, an element of needed finality."

*Id.* at 66–67, 105 S.Ct. at 477–478.

## CONCLUSION

The conviction of Dusan Lakich is AFFIRMED.